Good morning. Thank you for the opportunity to appear here this morning. Eric Seitz appearing for Mr. Oyama. Just preliminarily, I would like to point out to you that Mr. Oyama is here in the court. He's seated right there. And also in the court this morning, interestingly, is Dr. King, who is seated in the back there. Dr. King is the person who actually recommended and found a teaching position for Mr. Oyama in May of 2011. And you see the email from him about that in the record. I can give you the page citation if you'd like it. I came here prepared this morning to cite at least three additional cases, and I asked the clerk for the gum sheets, which we used to get. I guess I'm out of date, because apparently I was supposed to submit those online. But I would ask for the court's permission to go ahead and submit them to you after the argument, if that's okay? Yes, of course, you may. I think we should have those gum sheets. What happened to that? Okay, go ahead. With that in mind, first of all, let me suggest to you that this matter first arose on July 8, 2011, when Dr. Jeffrey Moniz wrote a letter to my client telling him that he was not going to be allowed to student teach. Prior to that time, my client was expecting to student teach. And as the record shows, he had no indication whatsoever that that action was impending or that there was a basis for not allowing him to continue and finish the program so he could qualify for a teacher's certificate and teach the subject matters that he wanted to teach in the public schools. If you read that letter, which is at page 509 of the excerpts of the record, you will see that only in detail does it refer to the content of Mr. Oyama's speech in classes, classes which he passed. So this is not a question of him failing any classes. It's simply a question, and was always a question, of his expressing views and opinions in classroom discussions, which the teachers found offensive. Now, you will also see as a basis for that letter that there was a whole buildup. First of all, Mr. Moniz wrote an initial draft. It was rejected by the dean's office. The dean's office was involved in fixing that letter so that they thought it would provide an adequate basis for the action that they had already decided to take. And you'll see the drafts of those letters and the correspondence back and forth about how they had to strengthen that letter. But nonetheless, when the final draft of the letter came out, it still only referred to the content of Mr. Oyama's speech, which was the basis for the action that they took. The speech that is at issue, was that solely confined to classroom discussions in the teaching program, or did it occur when he was actually in the practicum teaching students? Nothing occurred in conjunction with his classroom behavior when he was either observing or in the practicum. It only occurred in classroom discussions in a college of education. Well, it did have somewhat negative views of his practicum, and there was some reference to it, as I remember, a sentence or two. Yes, there was. But those were never shared with Mr. Oyama until after this action was taken. But in the letter that gave the reasons, there was some reference to it. Yes, exactly. But Mr. Oyama didn't know what they were talking about, because those, as the dean later pointed out in her final dispositive letter... But I'm wondering how that interacts with the First Amendment argument. Well, if they had reasons having to do with his actual performance in class, then he never should have been allowed to continue, or he should have been counseled, or he should have been warned that there are certain things that you're saying. Maybe that's all true, but how does it interact with our job? I mean, your basic argument is a First Amendment argument. So the question is, suppose they totally, invalidly, and so on, relied on the things he actually did in the classroom, but they shouldn't have done it, they should have counseled him, they should have had a letter, and so on, but that's not a First Amendment problem. No, that's right. But basically, what I'm suggesting to you is, first of all, I'm suggesting to you that, as Judge Reinhardt said in the Brown case, there are issues of fact here as to the motivations. This is not just simply a matter of, do we take an action based upon the outward aspects of the speech? There are factual issues about what transpired here, and most importantly, why it transpired. And therefore, in our view, summary judgment... But what was the role of his... Well, let me ask you this. Suppose they had not said any of this stuff about things he said in classroom, in any of the letters, and instead had said, you just did a lousy job of this practicum, and that's the most important thing for a student teaching, and you just came to be a student teacher. Suppose that's all they had said. If that had all been, that had been the sum and substance of it, then that would not raise a First Amendment issue, and it would basically be an academic evaluation and determination which says that you're not doing well in this program, and you're subject to whatever sanctions flow from it. So, there would have been an argument, sort of a Mount Healthy argument, that they would, that there was enough evidence that they at least partly relied on speech, that the burden would shift, and they would have to show they would have done it anyway? Is that what we should be doing? Basically, I think that's what the trier of fact should do. The trier of fact should say that given the overriding First Amendment aspects of this case, it is a determination that still needs to be made about what was the real basis for not allowing him to student teach, and I think that it's unclear from this record. The argument is, approach is sort of, it's not really what was the real basis, it's really a counterfactual question, i.e., what would they have done if they didn't do what they did? But did anybody ever make such an inquiry in this case, even on summary judgment? No. Basically, I think we all assumed, and I think the record substantiates, that the problematic aspects of this case were Mr. Oyama's substantive remarks to which they took offense, and therefore, that everything flowed from that. But all you would have to demonstrate is at least that it was partly based on that. Yes, that's correct. That's right. And, or they would have to demonstrate that if, in fact, First Amendment speech, protected speech, was involved here, that it did not impact this decision. So, my understanding is that their argument, the university's argument, is that the things he said in class demonstrated that he would be a bad teacher. Yes, and let me address that. And if, in fact, those things said that he would be a bad teacher, that he couldn't qualify for a teaching certificate, that he would never be licensed, then there is an argument that perhaps that is what we call curricular speech, that is an academic evaluation, and therefore, they're justified in making that determination. But the most important thing that's absent in this case is, first of all, everything that Mr. Oyama said was in response to questions or statements or issues that were placed on the agenda in the class. If you don't want controversial responses, don't ask the questions. Because in academician, when I teach constitutional law, which I teach at the university here, and I ask questions and I get answers that I don't like from my students, I can't grade them down or fail them for the content of their answers. I might argue with them and then I might get into the reasoning process by which they reach some of those decisions, but I can't fail them for doing that. And if you look at the cases I want to cite to you... Some of the comments he made were comments that clearly contravened state law and the rules that govern teachers with their students. Why couldn't those be held against him? Well, because they didn't ask the follow-up question and the follow-up question was, and can you conform your conduct as a teacher to what's required of you under the law? So, do they have to ask that question, I guess I'm wondering, because their job, they have to, this program has to certify to the state that this student is capable of entering a program, and so they have to certify to that. So what room do they have to say based on these comments, which are in conflict with what we think is appropriate curricular teaching, can we say we can't make that certification? Well, let me talk about a couple of these cases that I wanted to cite to you. First of all, Hennessy v. City of Melrose, which is a 1999 First Circuit Court decision. In that case, the individual was in a teaching practicum, was qualifying for a teaching position, and made some comments in class that were somewhat controversial about abortions, about homosexuality, and about diversity. In what class? This was in the practicum, preparing for licensure. In the classroom? Yes. Exactly like this situation here. Wait, no it's not. Wait, because you just told me it wasn't while he was in the classroom teaching. No, no, no. It was in the classroom learning. Then I think you misunderstood, because the Hennessy case was in the same situation. In the Hennessy case, the individual was in a teaching practicum where that person was being I'm not in the classroom situation where he was actually teaching students. Okay, well what's the situation here? These are classes at the School of Education. He was never teaching students. He expressed views in classroom discussions led by college teachers. He never acted out or committed any misconduct in the presence of students who he would be expected to teach as a student teacher or ultimately as a teacher. Yeah, so if I could understand your position in this case. I understand what you're saying. This was never in front of children. He was hoping to have the opportunity to move on to be a student teacher, to teach in front of children. Correct. Okay. So let's say, hypothetical, there's one slot and there are two applicants. They're identical in all respects, save one. During the interview for this position, one of them was not a crime. Okay, that's what the T-shirt says. Okay. In all other respects, they're identical. Is your position that the school district or the university program could not take that T-shirt into account in deciding between the two applicants? Yes, it is my position because I think basically, and if you let me again talk about some of these other cases, where an individual expresses views that may be controversial or even outrageous. The question really becomes, does the expression or holding those views, is it of such a nature that that individual cannot perform his or her responsibilities as a teacher in conformity with the standards of teaching that apply? And you have to ask that question and go beyond that. In this case, his mentor, Dr. King, felt as of two felt that my client, Mr. Oyama, was capable of teaching, found him an actual position, described him as a diamond in the rough and somebody who basically expressed views, perhaps off the top of his head, for the purposes of creating controversy in discussions at the College of Education. But there is no evidence anywhere in this record that Mark Oyama ever acted out or did anything or threatened to do anything that would violate his obligations or the standards by which he would be held to teach. There's no evidence of that. And again, you see even more about this in this case. You see that when Dr. Moniz was about to deliver his letter to Mr. Oyama, he contacted the director of security for the University of Hawaii and he said, we're afraid of this kid. We think he poses a threat. We need security when we give him this because we think something's going to happen. That was the frame of mind of the administration at the College of Education and why they refused to allow him to go forward. It had nothing to do with anything other than comments which were in response to questions opposed to him and to his College of Education classmates and they didn't like the answers. Now, again, I ask you to look at all of these cases because in all of the cases, and the most important case is the Brown case which was decided by this court in an opinion written by Judge Graber. And in that case, basically, the question arises, is this curricular speech? There was no controlling opinion in that case, right? At that point, yes. But Judge Graber basically went through very carefully and found that the only thing in that case that the university did was that it refused to allow the man's thesis to be placed in the library. In other words, they refused to put the university's imprimatur on what he'd put into his thesis. The guy actually got his master's degree. The guy actually graduated. But they would not publish his thesis by placing it in the library because it contained inflammatory information in there which was in violation of the university's policies and practices. It seems to me, Counsel, there's a difference. At least, I looked at an Eighth Circuit case called Padilla v. South Harrison School District. It's one thing to disagree with the school policy and I agree that dissertation is disagreeing with the policy. It's another where a teacher is advocating a position that could lead to the harm of children in the classroom. I think that is a problem and, therefore, what you have to do is make a determination of whether or not the advocacy of ideas has any impact on the qualifications or actual work that that teacher will be called upon to do. Well, I guess for the school district's perspective, then you would say they just need to wait and see if the issue comes up and then we'll see what happens? No, I don't suggest you wait and see. I think you subject that person to some sort of counseling process to determine whether or not these were just simply ideas that were advanced for the purposes of creating controversy and discussion or whether these are ideas which are of such a nature that will prevent the person from teaching. And there is a case out of Michigan, which is one of the cases I want to cite to you, where a person in a counseling program refused to counsel homosexuals. And in that case, the court held that you can't just simply dismiss that person because you have to determine whether or not that would interfere with the person's ability to perform her job if she is licensed as a counselor. And that's, in my view, what they failed to do here. If you start from the proposition, which they dispute, that this was protected speech in the first place, and I think they're flatly wrong about that, but once you find that it's protected speech, then they have to go farther. And then, in my view, the case... Those are hard questions. I mean, for example, there was a dispute in these letters, as I understand it, about some program in the disability class where they're supposed to refer to people with certain terms, right? No. The dispute was that Mr. Oyama said that he disagrees with the whole concept, which is law, of inclusion. I'm talking about something different. There was some curricular requirement that you say students with a disability instead of a disabled person, and it had some title for that kind of speech, that you should use a certain kind of language. Now, that presumably was... I understand that was part of what they were teaching people to do. And he didn't like it. Now, insofar as he just said, I don't like it, that's one thing. Insofar as he said, I'm not going to do it, I assume that if he didn't do it, they could grade him down. But he never said, I'm not going to do it. He never said that. Nor did he say with regard to the whole inclusion issue. And I specialize in special education cases. I know lots of educators who disagree with the concept of inclusion for the same reasons that Mr. Oyama did. But that doesn't mean they violate that requirement. They might speak out and say it's much more difficult for me to teach a group of students who have different levels of ability. But Mark was never asked. He just simply said, I don't like the inclusion requirement in my physics and math classes. But he never said that I wouldn't teach them or I wouldn't be able to teach them or I wouldn't even welcome that opportunity. He just said he thinks the requirement is wrong. The one time it appeared they asked him was on this thing about the age of consent and they pointed out to him that this was all illegal. And he said, well, then, of course, if I had to report it, I'd report it, as I understand it. Was that the only instance in which anybody ever pointed out to him that he was saying things that violated official policy? That's the only time in the record where I can see whether he was asked, whether his views, if they are impermissible to that degree, are views that would affect his performance. And on that occasion he said, as you quote, then obviously I would conform my behavior to what the law requires of me. And there's more to that discussion because the context of that was not about relationships between teachers and children. The context in which that arose was a discussion about government intrusion by tapping into persons' private computers to check whether they were receiving child pornography or not. And then it arose in that context. And, of course, that's been a very controversial issue even in this court. So the context of these discussions was also somewhat problematic and then they took them and ran with them and made a decision which I think was entirely inappropriate. And as I think the amicus brief makes clear, it could have very grave consequences for educators in these kinds of programs if they're allowed to follow this process. All right. So you're over your time. Let's hear from the university. Thank you. Good morning, Your Honors. Christine Thomas-Schur for the defendants appellees. I would like to address and basically break this up into two cases and respond to some of the comments. The plaintiff has made issues about the First Amendment violation of rights on his free speech in the classroom as well as the due process. I'd like to take on the First Amendment free speech issue first. This is not a case about restrictions on his speech. Could we start the clock? This is not a case about free speech restrictions. Why not? Because this is about a student and what's significant to note that it's a post-baccalaureate certificate program at the university. It's for individuals who are applying to obtain a certificate to be able to teach specifically in the public secondary schools, grades as well. So what it is is that you go through the classroom setting. At some point, you go through the field practice or the practicum. And the program is designed to prepare students to be candidates to teach in the secondary schools, teaching minors in the classroom setting, and also whether or not they're ready to be able to do that. That's what this program was. So Mr. Oyama started the program, as opposing counsel mentioned, on July 8, 2010, which is the summer prior to when he received the notification. During the course of the classroom discussions, just like you would take any credit courses, over the span of a year, multiple faculty members raised concerns about statements he made. And it's apparent that all of you have read the record and have made references to those particular statements. But they were statements about child predation, age of consent for sexual relations, whether or not he felt it was appropriate for a teacher to have sexual relations with minors. He mentioned to one particular faculty that he would bring arms to campus. And then when he was in the course about teaching disability... Is that illegal in Hawaii? To bring arms to campus? I believe it is. Well, I noticed that Texas just passed a statute allowing, I mean, I think it's crazy, but allowing people to carry concealed carry on campus. Is it illegal in Hawaii? I believe it is. I understand that... Anybody tell him that? I'm sorry? Was he told that? I believe, yes, that professor was Dr. Walton. So the point is, over the course of a year, different professors... So he said he would bring the guns even though they were illegal. He mentioned it. I don't know exactly the dialogue. I think it was raised that you cannot do that. And to keep in mind, this was back in 2010. But that discussion did occur with that professor. When he mentioned the comment about the child predation, that professor discussed that statement with him and said that's not appropriate. There is... What did he say? He then, the way she described it in her emails and the report that is in the record, she described it as him backpedaling. And then he said, yes, I would report that just as opposing counsel. Oh, backpedaling. Or you can call it recognizing the difference between something you believe and something you'll do. Correct. Well, and that was her assessment. I think the key is that within those classes, and you also mentioned about the disability class and what the acronym was. It's the PFL... I must say that I have read all of the things that Mr. Siegel, was that his name, was sending on of the things that Mr. Oyama said. And it just seemed to me that he was just incredibly overreacting. I mean, at one point, Mr. Oyama's paper says, to sum up, when it comes to controlling student behavior, I am believing in rules, powers, authority, and discipline, and really a believer in trying to convince other people to behave in a certain way with words. And Mr. Siegel says that he's now advocating corporal punishment. Yes, so with Mr. Siegel's class, there were a series of emails. And to the extent that you're saying that perhaps he was overreacting, it might be possible. I was not in the classroom. But based on what he observed... He's not in the classroom. He's reading written statements. I understand. But he was the instructor for that course. And I think what he was advocating was that for children with disability, the trend is to call it People First Language, PFL, which is to address them as individuals, as opposed to labeling them as people with disabilities. But I was reading something different. Okay, so there was a discourse with emails. And you're correct, though, Instructor Siegel, Jason Siegel, did have those email exchanges with Mr. Oyama. I think at the end of that is when he was concerned because what he saw as the instructor was that there was no change. He was sending basically every piece of paper that Mr. Oyama wrote to MUNOs as he wrote them, as I understand it. He kept saying, oh, here's another one that he sent. It seemed to be concurrent with him being sent, so it wasn't at the end. And he seemed to think, I don't know, he was... Maybe I'm too used to law school classes, but the kind of dialogues that were upsetting him so much seemed fairly normal in a law school class. So that's his assessment as he's seeing things progressing, and he had him for the whole semester. And so the thing is, Mr. Oyama was in this program to be able to teach in the public schools. The concerns raised by various faculty, as well as there was one semester where he was placed as part of the program, this is before he applied for his student teaching, to be paired with a teacher. And so he was paired with a mentor, that's Charles Souza, in the DOE Stevenson Middle School. He was there as an assistant for a whole semester. That particular faculty member, or DOE supervisor, who had the occasion to view him on a daily basis, interacting with children, when he rated him on the dispositions, he rated Mr. Oyama as unacceptable in key areas. So the issue is, the Brown v. Lee case, which this circuit has applied the Hazelwood standard, which the Hazelwood... Brown v. Lee case did not, in the majority opinion, apply the Hazelwood standard, did it? It did not. But what it did was it took guidance from the Hazelwood case, which was... Well, what if three opinions did? Correct. Okay. Correct. But that's the published opinion that we were relying upon in terms of the Brown v. Lee case. I'm sorry, but it's not a presidential opinion of this court, is it? It is not. And in my brief, I do state it is a non-binding opinion. That is the guidance that the district court used, as well as the Hazelwood case, and applied it to the evidence in this case. I believe that those cases were appropriately applied because it does give guidance as to what's curricular speech versus extracurricular speech or speech in the public forum. I think what I want to clarify is, opposing counsel mentioned that there was speech in the classroom. The curricular speech cases talk about things in the public school, which was the Hazelwood speech in the public school context, not in university setting. But what's odd about this case is that he was not, as I understand it, marked out or at least he wasn't failed in the classes because of these statements. Correct. They weren't considered unacceptable in the context of the classes. Correct. Instead, something was surmised from these statements about his ability to do things in the classroom. Correct. All right. So that seems entirely different because it's not really curricular speech in the sense that he was taught. The expectation of the class was that he learned certain things and he didn't learn them or he didn't express them properly or he didn't analyze them properly or anything like that, right? Correct. Correct. There is no dispute that he did not get failing grades, that he did not pass those classes that he took. But I think what's important to keep in mind is this program, again. We're going back to what the program is intended for, the goals and objectives, to get people through the program to be ready to teach in the classroom setting. So I was addressing the First Amendment issue, but I want to dovetail a little bit into the procedural issue. Before we get to that, there's one thing that we haven't talked about and it wasn't really briefed at all is qualified immunity. As I understand, the district court held in favor in the school district on the basis of qualified immunity, correct? That's correct for the two individual defendants. And so there was the university, which is the defendant, and we had two individual defendants. Both of them were the decision makers at different levels. He had three appeals. I thought the university wasn't dismissed on the Eleventh Amendment grounds. So the court's opinion was, I think, addressing all the issues. The very first issue on the Eleventh Amendment grounds was that the claims are barred and the university has Eleventh Amendment immunity. You are correct. But the court went on to discuss the actual merits. Because, of course, even though you dismiss the university because of the Eleventh Amendment, you still have the claims against the individuals. Correct. And the court did determine that both the individuals had qualified immunity because there were no constitutional violations. So they did go to the… Let's stop right there for a second. Now, again, I read the district court's order. It's decided on qualified immunity grounds. I didn't see that briefed at all in any of the briefs. The opening brief, the answering brief, or the reply brief here. Now, normally, in a case like this, if a side wins on qualified immunity, they're waving that qualified immunity flag to some of the anger of some of our colleagues on this court. But the fact is that that didn't happen here. Are you, at this stage, not arguing qualified immunity? I am not arguing qualified immunity specific to the issue presented because the university's response was in response to what the plaintiff appellant had raised as the issues presented and to address those particular questions. And so the issues before the court, at least I understood from the brief, was that the district court erroneously determined that there were no genuine issues of fact and therefore there was no violation of the First Amendment and that the district court erroneously applied rules or the cases and determined that there were no personal violations. Is it fair for her injunctive relief here? She doesn't want to be, she doesn't want the student changed? That's not for me to say. Well, it's for you to say because obviously it would make a huge difference as to whether there is a, the qualified immunity wouldn't apply to that claim. So is that in the case or not? My understanding is that's what was not raised. At one point, my understanding was when he was going through the appeals process, he was requesting, he requested a variety of things. Injunctive relief was... What about in his court case? He raised it, but I don't believe it was, and I think we responded to it at the district level. I don't recall in terms of, to me, I think that they didn't pursue it. Well, they couldn't pursue it if they lost from the merits, but if they won in the merits, was he seeking injunctive relief? As far as I understood, he was seeking injunctive relief. All right. So therefore, qualified immunity wouldn't apply to that. Right. Again, well, he fought it against the university, and he was raising... Correct. You are correct. Correct. Okay. So for the purposes of our decision-making, we should not consider qualified immunity. Is that what you're telling us today? That's what my position is. That wasn't something that was raised, and it's... Well, it's for you to raise. I mean, it's your defense. It's not for them to raise it for you. Understood. This is a complicated case, and I'm just trying to understand. The brief, the blue brief, should have addressed what the district court ruled, not just ignore the qualified immunity question. I mean, in this area where we haven't extended Hazelwood to this type of discourse, and that's an issue that's in front of us, it seems like the whole issue of qualified immunity, based on the fact that there's no clearly established right, is probably the critical question in the case. That's possible, yes. Possible? You're arguing nebulous areas of First Amendment law here. The district court held both as to the injunctive relief and as to the qualified immunity as to damages and sin, and her holding was summary judgment as to prospective injunctive relief against sorensen immunos in their official capacity. So that issue definitely raises the First Amendment issue head on, right? Yes, it does. It does. And so the way we approach it was addressing the actual substitute constitutional rights that were raised and showing that there was no violation of either the First Amendment or the Fourteenth Amendment. So in this case, for the First Amendment, you know, we've gone through all the cases, which the curricular speech, I mean, those were in the context. I think what's important to note for the procedural due process issue also, or the substance. So the core question is, could they, let's put aside the practicum for a moment, because it was at best a small part of the reasons that were given. So maybe it would, you know, if there were a trial or if we went forward, you would have a Mount Healthy sort of a defense that you would have done it anyway. But you certainly relied in large part on things that he wrote in the classroom or said in the classroom, right? I respectfully disagree. I don't think that the practicum was a small portion. I think it's a continuum. And I think that what was mentioned in one or two sentences, and it was later determined that it really shouldn't have been relied upon because he wasn't given a chance to sign it and see it and so on. Yeah, but I don't think that's accurate because that practicum rates him on 15 different dispositions, all of which he had notice of in the handbook, all of which there is that same. Well, that may be, but it's not what the university decided. But anyway, it doesn't matter because in large part, the decision was based on things that went on in the classroom, right? Correct, speech in the classroom. So at best, it could be a defense for you. Yes, it could. It's a continuum. And he had an opportunity to raise those things. He had multiple opportunities to review. Any explanation he had as to mentioning that it was a controversial topic, that he was just trying to extend his opinion. Where did he have an opportunity? He did say that in the hearings and in the appeals and so on. Yes, so when he responded to the director on that level, there was a STARFAC committee of three different faculty members. They interviewed him. They interviewed other faculty. He had an opportunity to raise it then. And the final level of decision at review was the dean. And he did raise it then? He did. And what did they say? They said that even though they agreed that he was not given the evaluation at the end of that semester, they felt he was still unacceptable as a student teacher in the program. And he also, at the end of the decision with the dean, had the opportunity to go through counseling to figure out what next steps might be, what other opportunities might be available for him. He did not take that up. He asked the school for a tuition refund. And then when they offered the refund, he declined the refund and chose to file suit. So there was no other discourse beyond that third level of appeal for the university to work with him to figure out what he could do. By the way, what does dispositional data mean? That term is used a lot, and I don't know what it meant. There are 15 categories for this particular program. It's in the handbook. It's the list. And it's the same thing that Dr. Irv King rated him on. And counsel had mentioned that Dr. King is in the courtroom. While he was his mentor initially, I think Dr. King also rated him as unacceptable in seven of the 15 categories. So the dispositions are things like ability to interact with students, ability to obtain feedback, a professional dress, because, again, these are candidates who are going to be in the classroom teaching minors. So the dispositions, there are 15 of them, all intended to gauge someone's ability to be a teacher for minors in secondary public schools here in Hawaii. All right. Thank you, counsel. Your time's up. You used all of your time, but I let this counsel go. You can have a couple minutes over. Thank you. I just want to address the qualified immunity issues. First of all, if you look at the complaint, it does ask for temporary, preliminary, and permanent injunction and declaratory judgment. So certainly qualified immunity is irrelevant with regard to those claims. Secondly, Judge Gilmour ruled on the first prong of the qualified immunity test, namely that there was no federal protected right here. So she never really got into the other portions of that test, and that's why in our brief we basically confined our arguments to the fact that there is a federally protected right here of free speech and that she was respectfully wrong in that determination. And that really is why we didn't go beyond that to discuss whether or not qualified immunity was appropriate here, because it all hinged on that initial finding that there was no protected speech. If that's correct, then let's say we agreed with you on the first point. We would then need to send this back, I presume, to the district court to finish up the qualified immunity rule. Absolutely. That's my belief. Because we never got to that point. We never really argued anything more than whether or not this was a free speech case. And finally, let me say, I hope I agree with the sentiments that were expressed. This is not a Hazelwood case. Our client was never asking the university in any manner whatsoever to adopt any of the views that he expressed. He basically was just throwing those views out. Now, again, you look at the context here and look at what a finder of fact might have decided. Marco Yama went to California Tech University and got a degree in mathematics. He then went on and got a master's in physics. He's not your typical social sciences or arts student. He had a very narrow kind of exposure in his education, and then he's in a forum in the College of Education, and he raises all kinds of things which are controversial. But he doesn't raise them for the purpose of threatening anybody. He raises them for the purpose of discussion, and that's what was intended by the professors who asked the questions in the first place. And finally, let me say with regard to the questions about Jason Siegel, Jason Siegel was on a campaign, and I think all of his communications in the record indicate that. But he was asked for those comments by Munez at the instigation of the dean because they were trying to beef up the reasons for not allowing Mr. Oyama to continue. And so Jason Siegel expressed these views over and over again, and I think aggravated them enormously as part of a mission to prevent Mark from being allowed to student teach, and that's ultimately what occurred. All right. Thank you, counsel. Oyama v. University of Hawaii is submitted.
judges: Wardlaw, Berzon, Owens